IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| ANGELA CORVISON-SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:23cv575-MHT |
| | ) | (WO) |
| NAVSAV HOLDINGS, LLC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Angela Corvison-Smith brings this employment-discrimination suit against defendant NavSav Holdings, LLC, claiming that the company violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a and 2000e through 2000e-17, by firing her because she was pregnant. Jurisdiction is proper under 42 U.S.C. § 2000e-5(f)(3) (Title VII), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343 (civil rights). Before the court is NavSav's motion for summary judgment. For the reasons below, the motion will be denied.

## I.   LEGAL STANDARD

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in favor of that party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment is appropriate.  *Id*.


## II.  BACKGROUND

The facts, taken in the light most favorable to Corvison-Smith, are as follows.

A.

NavSav is a holdings company that acquires, owns, and operates commercial insurance agencies across the United States.  These agencies primarily rely on the work of producers and commercial account managers ("CAMs").  Producers sign up businesses to be an agency's 'client' and buy insurance through the agency, which acts as a middleman between clients and insurance companies.  CAMs then manage client accounts by communicating with them, providing them with certificates of insurance, and selling them on renewing their insurance when it is set to expire.

In May 2022, NavSav recruited Corvison-Smith.  She had been a CAM for nearly a decade, and, at the time the company reached out, she was working as a CAM at an agency that specialized in trucking and construction insurance. The company hired her to work remotely as a CAM for an office that focused on trucking insurance.  But on her first day, the company reassigned her to its Montgomery

office, where she would handle general business insurance rather than trucking insurance.

In early October 2022, Corvison-Smith became pregnant, and the news quickly spread around NavSav. That month, she told her direct supervisors. And, by early December, Ragen Murray, NavSav's Vice President and Head of Human Resources, learned about Corvison-Smith's pregnancy. The two of them emailed and later called to discuss the pregnancy and the company's maternity leave policies.

Around this time, NavSav's Montgomery office ran into trouble. The company's business is seasonal; it typically loses money in the winter but makes up those losses during the summer, when clients ordinarily renew their accounts. Thus, the office is normally prepared to adjust for the business seasons. There was, however, an unexpected snag that winter. Don Cook, a producer in the Montgomery office, left with many of the office's clients. The office began hemorrhaging money.

4

Luckily for NavSav, Cook left during the off-season, giving it an opportunity to recuperate lost revenue.  It hoped to recuperate its losses that summer.

### B.

As NavSav was preparing for the summer, a conflict brewed at the Montgomery office.  When Corvison-Smith was hired, Denise Crowell--the Montgomery office's other, more senior CAM--was supposed to teach Corvison-Smith about the clients in Crowell's book and then split those accounts between them.  Crowell refused to do either.

Eventually, a call was scheduled to discuss the conflict.  While the parties dispute the details of the call, the court will assume Corvison-Smith's account.  She asserts that, on January 25, 2023, she had a team call that included herself, her direct supervisor Anita Tomren, Vice President Murray, and NavSav CEO Brent Walters.  They discussed the issues regarding Crowell, and all agreed that she was the problem, not Corvison-Smith.  They also talked about Corvison-Smith's

work experience and how she was initially going work at NavSav's trucking office. CEO Walters allegedly responded, "that actually is perfect because [NavSav's] trucking offices needed help" and he suggested that she would be sent to work with those offices. Corvison-Smith Depo. (Doc. 24-7) 53:14-15.

That same day, Walters and Murray discussed making payroll cuts, including cutting Corvison-Smith. That morning, Walters sent an email to various senior managers, including Murray, which conveyed that the company was over payroll, and asked the senior managers to investigate whether they "can cut any [CAMs]." Email (Doc. 24-10) 3. Later that day, Walters and Murray had a private phone call where they discussed cutting Corvison-Smith.[1] And that evening Murray replied to Walters's morning email; she stated that the senior managers found some cuts. Walters quickly responded,

_____

1. The record is unclear about when the call happened, other than that it occurred before the Walters's response that evening. Viewing the facts most favorably to Corvison-Smith, the court will assume the call occurred shortly after the team call on January 25.

6

"Awesome. Did this include Angela [Corvison-Smith] at 50 and Zach at 80." *Id.* 2.

The next day, Vice President Murray emailed CEO Walters back with a list of 12 employees from offices across the country. Eleven of the 12 employees were producers. Six producers received a pay cut, lost benefits, or had their pay restructured. The remaining five producers previously resigned or left NavSav as part of a reduction in force; most of them had a notation next to their name indicating whether they were being replaced. Corvison-Smith was the twelfth and final employee on the list; she was the only employee with the notation "terminate" next to her name and the only full-time CAM on the list. *Id.* 1.

A few minutes later, Walters ordered Murray to make the cuts. The next day, Corvison-Smith was told that NavSav was terminating her employment. When she asked why, she was given little explanation.

Corvison-Smith was surprised by her firing as it came without warning and shortly after a positive team call;

she eventually concluded that her pregnancy was the only
explanation.  In essence, she believed NavSav fired her
because her pregnancy meant that she would be on leave
over the summer, thereby hindering the company's summer
plans.[2]  Thus, she filed an EEOC charge claiming that the
company discriminated against her because she was
pregnant.

A month later, in March, NavSav responded to the
charge.  It denied discriminating against Corvison-Smith
and claimed that she was not fired; instead, it
represented that she was laid off as part of a reduction
in force.  It also asserted that it terminated her
employment because she was unqualified for her job.

That said, the week after Corvison-Smith was fired
NavSav did an about-face.  Despite Walters's email about
cutting CAMs, Murray posted on LinkedIn for an 'onsite'

---

2.  When Corvison-Smith filed the charge, she argued
that her pregnancy would hinder NavSav's summer plans
because it meant that she would be on leave when the
office began an important transition to a new insurance
processing system.  With the benefit of discovery, she
now also argues that her pregnancy hurt the company's
ability to recover its losses that summer.  The court
will focus on her latter reason.

CAM position at the Montgomery office.  And, in July, the company hired Christina Michelle Allen, who was not pregnant, to work as a CAM for its Alabama offices, including its Montgomery office.  She and Crowell jointly took over Corvison-Smith's duties until September, when Crowell resigned.

## III. DISCUSSION

### A.

Corvison-Smith's sole claim is that NavSav violated Title VII by firing her because she was pregnant.  Title VII prohibits employers from firing employees "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  *See* 42 U.S.C. § 2000e-2(a)(1).  To establish such a pregnancy-discrimination claim, an employee needs to show only that her pregnancy "was a motivating factor" in her firing even if "other factors also motivated [the

decision to fire her].″  42 U.S.C. § 2000e-2(m).[3]  In other words, it is enough if Corvison-Smith's pregnancy was just "'a' motivating factor" behind NavSav's decision to fire her; her pregnancy does not have to be "'the' motivating factor." *Rawlinson v. Whitney Nat'l Bank*, 416 F. Supp. 2d 1263, 1268 (M.D. Ala. 2005) (Thompson, J.).

A plaintiff may establish intentional pregnancy discrimination by amassing a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker," which is just a "rearticulation of the summary judgment standard." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946-47 (11th Cir. 2023).  Therefore, to survive summary judgment, Corvison-Smith must provide enough evidence for a reasonable factfinder to conclude that it

---

3. The parties also argue over whether NavSav waived the 'same-decision defense' because it did not assert that affirmative defense in its answer to the complaint as required by subpart (c) of Rule 8 of the Federal Rules of Civil Procedure.  As that defense limits only the available remedies, not liability, *see Desert Palace, Inc. v. Costa,* 539 U.S. 90, 94 (2003), the court need not, and will not, decide that issue on this motion.

was more likely than not that her pregnancy was a motivating factor in NavSav's decision to fire her. *See Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012).

B.

Corvison-Smith contends that her pregnancy was a motivating factor in NavSav's decision to fire her, and that the reasons it gave for its decision are pretextual, that is, a lie. She asserts that the Montgomery office was losing money and that the company hoped to recuperate any losses that summer. Her pregnancy put a hitch in those plans because it meant that she would be on leave that summer, leaving the office with one less CAM to sell clients on renewing their insurance. She submits that the company fired her and tried to replace her with a nonpregnant employee.

Contrary to NavSav's assertions, Corvison-Smith has produced enough evidence for a reasonable jury to find

that her pregnancy was a motivating factor in the company's decision to fire her.

### 1.

Corvison-Smith provided evidence that Murray and Walters knew about her pregnancy.  In early December 2022, Murray found out about the pregnancy and discussed NavSav's maternity leave policies with her.  As pregnancies usually last nine months and Murray did not "think [Corvison-Smith] was very far along when [they] spoke," a jury could reasonably infer that Murray believed Corvison-Smith would be due sometime between May and August, Murray Depo. (Doc. 24-2) 28:1, that is, that she would be taking maternity leave over the summer. Plus, a jury could reasonably infer from the January phone call, where Walters and Murray talked about cutting Corvison-Smith, that they also discussed her upcoming maternity leave.

2.

Corvison-Smith has also produced evidence that Murray and Walters were worried about the Montgomery office being understaffed in the summer during Corvison-Smith's pregnancy. She produced testimony that they were worried about the money that the office lost over the winter and hoped to recuperate any losses during that summer by selling insurance renewals to clients. A jury could reasonably infer that they believed that Corvison-Smith's maternity leave would hinder this plan, since it would leave the office with only one CAM, Crowell, to sell insurance renewals.

Corvison-Smith also provided testimony that Murray and Walters were concerned about Crowell quitting at any point. A jury could reasonably find that, if she quit during that summer, it would leave the office unable to recuperate its losses since the office would be left without CAMs to sell renewals that summer. Murray and Walters, therefore, had a strong incentive to fire

13

Corvison-Smith and replace her with a CAM that could work that summer.

3.

Corvison-Smith submitted evidence that would allow a jury to find that Murray and Walters acted on that incentive by firing Corvison-Smith and trying to replace her with a nonpregnant employee.

The timing between when an employer learns of an employee's pregnancy and her firing may be contributing circumstantial evidence that the former event was related the latter. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). For example, if an employer learns that an employee is pregnant and she is fired two weeks later, the short time between the events may suggest that she was fired because of her pregnancy, *see id.,* or, if the employee were fired several months later, the circumstantial evidence of a link could be weaker, if non-existant. *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001).

14

Here, Corvison-Smith was fired about a month and a half after Murray learned of Corvison-Smith's pregnancy and plans to take maternity leave. This timing is close enough, in conjunction with other evidence, to suggest that the events may be related. *Cf. Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1327 (11th Cir. 2020) (finding nearly two months between an employee's protected conduct and when he faced an adverse action was not enough, by itself, to show that the former caused the latter).

### 4.

Corvison-Smith also produced other, extensive evidence of pretext. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). NavSav gave two reasons for its decision, both of which Corvison-Smith asserts are pretextual.

15

i.

NavSav asserts that it terminated Corvison-Smith because she was unqualified to be a CAM and Corvison-Smith expressly said as much to Walters and Murray. The company submits that Corvison-Smith expressly told CEO Walters, on a private call between the two of them, that she was unqualified to be a CAM. She also allegedly said that she did not know how to do several of her duties, including, for example, marketing insurance. The company asserts that she repeated those statements on the team call.

Corvison-Smith, however, has provided enough evidence for a jury to conclude that NavSav's reason is pretextual. For starters, she denies ever making the statements. Moreoever, it makes sense that a court should look quite suspiciously on an employer's reason to terminate a person when that reason is because she is "unqualified," when only months earlier, when hired, that same employer viewed her as "qualified", and in between

16

the two events the employee has become "pregnant".  Or,
to put it another way, the fact that an employer viewed
a person as qualified when hired suggests that the
employer, in truth, still considered her qualified when
she was terminated only months later, after becoming
pregnant.  The later contention that the employee is
unqualifed is suspect.

Corvison-Smith also had a history of working as a
CAM at other companies, which according to her account,
led Walters to tell her that she would be an "asset" to
the company's trucking offices.  Corvison-Smith Depo.
(Doc. 24-7)    54:2.           Additionally,     Tomren,
Corvison-Smith's direct supervisor, testified that she
was qualified and even fought against her firing.

ii.

NavSav asserts that Corvison-Smith's position was
eliminated as part of a reduction in force.  The company
submits that the Montgomery office was over payroll and
overstaffed because it needed only one CAM.  The company

17

contends that it therefore sought to cut a CAM from that office and chose Corvison-Smith because she was less experienced than Crowell. However, a reasonable jury could also find that this reason is pretextual. For example, a jury could conclude that Murray's posting for a CAM position in the Montgomery office, a week after Corvison-Smith's termination, suggests that the company did not eliminate her position but sought to replace her. *See Mitchell v. Russell Lands, Inc.,* No. 12-cv-458-WKW, 2013 WL 2422709, at *4 (M.D. Ala. June 3, 2013) (Watkins, C.J.).

Also, the list of cuts that Murray emailed had "terminate" next to Corvison-Smith's name, rather than a notation stating whether she was being replaced like many of the other employees laid off as part of a reduction in force. Email (Doc. 24-10) 1. A jury could infer from that inconsistency that she was independently fired rather than laid off as part of a reduction in force.

iii.

Still, NavSav makes several other arguments for why summary judgment should be granted in its favor.

First, NavSav asserts that for various reasons Corvison-Smith has not established a prima-facie case under the framework laid out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). That framework, however, does not apply to 'mixed-motive' claims, such as this one. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1232 (11th Cir. 2016). In any event, "[o]n an employer's motion for summary judgment, it is often beside the point for a district court to dwell on whether the employee has successfully established a prima-facie case. ... [T]he burden at the first two stages of the *McDonnell Douglas* burden-shifting analysis is 'light' for both the employee and the employer. ... [T]he presumption of discrimination created by the prima facie case simply drops out of the picture. ... The question is simply whether there is enough evidence to show that the reason for an adverse employment action was illegal

19

discrimination." Webster v. City of Montgomery, 710 F.Supp.3d 1116, 1123 (M.D.Ala., 2023) (Thompson, J.) (cleaned up).

Second, NavSav asserts that the job posting the week after Corvison-Smith's firing was not for her position, but rather was for Crowell's position because it was for a position "onsite" in Montgomery, not a remote position like Corvison-Smith's. Reply Br. (Doc. 29) ¶ 18. The company submits its view of the facts is supported by testimony from Walters and Murray suggesting that the posting was created to find a replacement for Crowell.

While NavSav presents one view of the facts, a jury could take a different one. It could disbelieve Walters and Murray's testimony, and instead find that the posting was for Corvison-Smith's position, given the posting's conspicuous timing, that Crowell was still working for the company for months after the posting, and that she continued to work for the company months after Allen was hired and took on CAM duties at the Montgomery office.

Plus, a jury could conclude that Corvison-Smith was replaced regardless of whether the job posting was onsite. "A plaintiff may demonstrate that [s]he was replaced by showing that, after [her] termination, some of [her] former responsibilities were delegated to another employee, in addition to that other employee's own responsibilities." *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1271 (11th Cir. 2014). Here, NavSav concedes that Corvison-Smith's duties were reassigned to Crowell and Allen. Thus, even if they had extra duties such as being onsite or also working at other Alabama offices, a reasonable jury could conclude that they replaced Corvison-Smith.

## C.

Upon consideration of the evidence described above and considered together, the court concludes that summary

judgment in favor of NavSav is inappropriate in this case.

Accordingly, it is ORDERED that defendant NavSav Holdings, LLC's motion for summary judgment (Doc. 24) is denied.

DONE, this the 19th day of August, 2025.

      /s/ Myron H. Thompson
    **UNITED STATES DISTRICT JUDGE**